# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

### CASE NO.: _____

Jonathan Blum, Bromson Investments, Ltd.,
a Florida limited liability partnership,
Beauperthuy Enterprises, a Nevada limited
partnership, Neisser Burgos, Jaime Carbonell,
Daniel Chan, Robert and Kara Dunne,
Gary Hill, Robert and Karen Keller, KAKT
Inc., a Florida corporation, George and Keri
Kolettis, Gregg Lacoste, Christopher Lopez,
Michael Melchior, Matthew Mendez-Zfass,
Mark Merlin, Robert Norton, Stephen Quinnan,
Christopher Reeves, Jeremy Schwartz, J Bones
Holdings, LLC, a Florida limited liability
company, Daniel Segina, Alan Selner,
Steven and Stacey Steinlauf, AACJ Properties
LP, a Nevada limited partnership, and
Christopher Wong, (collectively "Plaintiffs"),

           Plaintiffs,

vs.

INTERNAL FIXATION SYSTEMS INC., a
Florida corporation, STEPHEN J. DRESNICK,
JAY HIGGINS, BOB KUECHENBERG, and
ROBERT M. HOFFMAN,

           Defendants.

_____/

## **COMPLAINT**

Plaintiffs, through counsel, sue Defendants Internal Fixation Systems, Stephen J. Dresnick,

Jay Higgins, Bob Kuechenberg and Robert M. Hoffman (hereinafter collectively "Defendants") and

state as follows:

1

## NATURE OF ACTION

1.      This is a federal securities case arising from Defendants' misrepresentations and omissions of material facts in violation of the federal securities laws and Florida state law.  Plaintiffs now bring the following causes of action against Defendants:

| Count I | Violations of Section 10(b) of the Securities Act of 1934 ("Exchange Act of 1934"), 15 U.S.C. §78j and Rule 10b-5 promulgated there under, 17 C.F.R. §240.0b-5; |
|---|---|
| Count II | Violations of Section 12(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §77l; |
| Count III | Violations of Section 20(a) of the Exchange Act of 1934, 15 U.S.C. §78t; |
| Count IV | Violations of Section 15 of the 1933 Act, 15 U.S.C. §77o; |
| Count V | Breach of Fiduciary Duty; and |
| Count VI | Aiding and Abetting a Breach of Fiduciary Duty. |

And pursuant to those claims, Plaintiffs seek damages, rescission, pre-judgment interest and fees and costs.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the laws of the United States; Section 27 of the Exchange Act of 1934 (15 U.S.C. 78aa) and Section 22(a) of the 1933 Act (15 U.S.C. § 77v(a).   The Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.

3.      Venue is proper in this district pursuant to Section 27 of the Exchange Act of 1934 and Section 22(a) of the 1933 Act, as defendants conducted business in this district and many of Defendants' acts and conduct charged herein occurred in this district.  Further, venue is proper in this

district pursuant to 28 U.S.C. §1391(a)(2) in that a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

4.      In connection with the acts and course of conduct alleged in the Complaint, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate wires and interstate telephone communications.

## PARTIES

5.      a.      Plaintiff Jonathan Blum is *sui juris* and is a resident of Orange County, Florida.

b.      Plaintiff Bromson Investments, LTD., is a Florida limited liability partnership with its principal place of business in Broward County, Florida.

c.      Plaintiff Beauperthuy Enterprises LP is a Nevada limited partnership with its principal place of business in Coral Gables, Florida.

d.      Plaintiff Neisser Burgos is *sui juris* and is a resident of Miami-Dade County, Florida.

e.      Plaintiff Jaime Carbonell is *sui juris* and is a resident of Miami-Dade County, Florida.

f.      Plaintiff Daniel Chan is *sui juris* and is a resident of Broward County, Florida.

g.      Plaintiffs Robert and Kara Dunne Jaime are both *sui juris* and residents of Brevard County, Florida.

h.      Plaintiff Gregg Lacoste is *sui juris* and is a resident of St. Tameny Parrish, Louisiana.

3

     i.     Plaintiff Gary Hill is *sui juris* and is a resident of Tulsa County, Florida.

     j.     Plaintiff Robert and Karen Keller are both *sui juris* and residents of Broward County, Florida.

     k.     Plaintiff KAKT, Inc., is a Florida corporation with its principal place of business in Palm Beach County, Florida.

     l.     George and Keri Kolettis are both *sui juris* and residents of Palm Beach County, Florida.

     m.     Plaintiff Michael Melchior is *sui juris* and residents of Miami-Dade County, Florida.

     n.     Matthew Mendez-Zfass is *sui juris* and is a resident of Miami-Dade County, Florida.

     o.     Plaintiff Mark Merlin is *sui juris* and is a resident of Palm Beach County, Florida.

     p.     Plaintiff Robert Norton is *sui juris* and is a resident of New York City, New York.

     q.     Plaintiff Stephen Quinnan is *sui juris* and is a resident of Miami-Dade County, New York.

     r.     Plaintiff Christopher Reeves is *sui juris* and is a resident of Orange County, Florida.

     s.     Plaintiff Jeremy Schwartz is *sui juris* and is a resident of Brevard County, Florida.

t.      Plaintiff J Bones Holdings, LLC, is a Florida limited liability company with its principal place of business in Lee County, Florida.

u.      Plaintiff Daniel Segina is *sui juris* and is a resident of Palm Beach County, Florida.

v.      Plaintiff Alan Selner is *sui juris* and is a resident of Manhattan Beach, California.

w.      Plaintiff Steven and Stacey Steinlauf are both *sui juris* and residents of Broward County, Florida.

x.      Plaintiff AACJ Properties, LP, is a Nevada limited partnership with its principal place of business in Las Vegas, Nevada.

y.      Plaintiff Christopher Wong is *sui juris* and is a resident of Miami-Dade County, Florida.

z.      Plaintiff Christopher Lopez is *sui juris* and is a resident of Miami-Dade County, Florida.

6.      Defendant Internal Fixation Systems, Inc. ("IFS") is a Florida corporation with its principal place of business in Miami-Dade County, Florida.  IFS specializes in the manufacture and marketing of orthopedic and podiatric implants and its customers include ambulatory surgery centers, hospitals and surgeons.  On Friday, the 13th of May 2011, IFS became a public corporation. IFS' securities are registered with the Securities and Exchange Commission ("SEC") under Section 12(g) of the Exchange Act (15 U.S.C. §78l(g)) and trade on the OTC-QB under the ticker symbol "IFIX".

5

7.      Defendant Stephen J. Dresnick is a resident of Miami-Dade County, Florida and is the Chairman, Chief Executive Officer and President, interim Chief Financial Officer and Secretary of IFS.

8.      Defendant Jay Higgins is a resident of Miami-Dade County, Florida and is a Director of IFS.

9.      Defendant Bob Kuechenberg is a resident of Miami-Dade County, Florida and is a Director of IFS.

10.     Defendant Robert M. Hoffman is a resident of Miami-Dade County, Florida and is outside counsel for IFS.

11.     Defendants Dresnick, Kuechenberg and Higgins are collectively referred to herein as the "Company Defendants".

12.     Because of the Company Defendants' positions with IFS, they had access to the adverse and undisclosed information about IFS' business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided therewith.

13.     At various times throughout the Complaint, the Company Defendants are treated as a group for pleading purposes and the false, misleading and incomplete information conveyed in IFS' public filings, press releases and other publications as alleged herein are the collective actions of this narrowly defined group.  The Company Defendants were directly involved in the day-to-day operations of IFS or were privy to confidential information concerning IFS business and finances.

6

These Company Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; were aware or recklessly disregarded, that the false and misleading statements were being issued regarding IFS, and approved or ratified these statements, in violation of the federal securities laws.

14.    As controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC, and is traded on the OTC-QB, the Company Defendants had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance and to correct any previously issued statements that contained false, misleading or materially incomplete information so that the market price would be based on accurate and true information.

15.    The Company Defendants, because of their positions of control and authority as officers and/or directors of IFS, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to IFS.  Each of the Company Defendants was provided with misleading documents prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Each Company Defendant is responsible for the accuracy of the public filings and releases detailed herein and is therefore primarily liable for the representations therein.

## FACTS

### Objective of the Misrepresentations and Omissions

16.    In late 2011 and continuing through at least May 2012, IFS and Dresnick intentionally planned or with reckless disregard allowed through various misrepresentations and omissions of material fact to keep information that would have an adverse impact on the stock price of IFS from

public disclosure. By precluding the public disclosure of adverse information and further controlling what in fact was disclosed to the public through SEC filings, IFS and Dresnick were able to manipulate the stock price and trading volume until such time as IFS and Dresnick secured the ability to sell-off over 1 million shares of IFS stock to the detriment of IFS shareholders who were not provided with the true picture of IFS until after the stock price had plummeted from $2.30 per share in December 2011 to less than 2 cents per share in June 2012. IFS and Dresnick engaged in such conduct because of an improper agreement with a third party which allowed IFS and/or Dresnick to secretly profit from the sale of the 1 million shares to the detriment and exclusion of IFS' shareholders and further allowed Dresnick to gain control of 80% of the common stock of IFS.

    **A.**    **Failure to Disclose Critical & Material Information**

    17.    The Company Defendants have to the date of this filing not fully disclosed the details of certain transactions and other materially adverse and mandatorily reportable events affecting IFS. Further, the public disclosures that have been made are inadequate or incomplete and as a result misleading. The events, in particular, the Company Defendants failed to provide material disclosures include, among others:  (1) a 2012 loan transaction/stock conversion with Eastern Institutional Funding; (2) IFS' eviction from its manufacturing facility in April 2012; (3) IFS' loss of its manufacturing capacity and equipment in April 2012; (4) resignation of various directors and key executives; and (5) demand by an IFS Director on April 24, 2012 that the Director's loan to IFS be paid in full. At all times, Defendant Dresnick directly controlled the amount and scope of IFS public disclosures.

    **B.**    **Late Disclosure of Material Events**

    18.    Federal securities laws require the timely disclosure of material events and corporate

changes which are of importance to investors and previously have not been reported. SEC Form 8K is the "current report" form provided by the SEC for such timely reporting. The form itself requires that reportable events be disclosed within four (4) business days after the occurrence of the event. The SEC has also provided clear direction of the types of events that trigger a public company's obligations to file a current report.

19.     IFS and the Company Defendants routinely and purposely or recklessly failed to comply with their timely disclosure requirements. IFS and the Company Defendants made late disclosures of various material and reportable transactions and events in violation of SEC rules and regulations. They include among others:  (1) IFS secured financing from Asher Enterprises, Inc. which closed in December 2011 but was not disclosed in SEC filings until March 9, 2012; (2) IFS secured financing from Peak One Investments which closed in March 2012 but was not disclosed in SEC filings until May 21, 2012 (critically, Defendants failed to disclosed this transaction on IFS' March 31, 2012 10K filing) even though the financing was secured by all of IFS' assets; (3) IFS secured financing through a debt conversion to common stock from Eastern Institutional Funding which closed in March 2012 but was not disclosed in any SEC filing until May 21,2012; (4) a board member resigned on June 26, 2012 but IFS did not disclose this reportable event until July 18, 2012 when if filed a Form 8-K; (5) the nature and severity of the eviction action which resulted in IFS' loss of its manufacturing capabilities in April 2012 as well as its manufacturing equipment was never adequately disclosed; and (6) the dismissal of key directors and employees, such as the dismissal of Director and Vice President of Engineering and Quality Control on December 30. 2011, which was not reported until March 9, 2012 in an SEC Form 8K or the dismissal of the Director of Quality on December 30, 2011 which was never reported on any public disclosure. At all times, Defendant

Dresnick directly controlled the timing of IFS' public disclosures.

**C.      Dresnick's Continual and Repeated Assurances to Shareholders**

20.      Dresnick continually and repeatedly advised IFS shareholders and executives that he had already secured financing and capital for the company.  These assurances were made to provide comfort shareholders and executives as to IFS's prospects for success and in turn the success of shareholder's investment in IFS.  Dresnick's assurances of secured financing and capital were not accurate and designed to mislead or were made with reckless disregard of their truth.  As late as May 2012, and during the time when the stock price was taking a precipitous drop due to the efforts of Dresnick and others to dump IFS stock on the market, Dresnick continued to assure investors that their investments were secure and that much needed financing was in place to resurrect IFS.

**D.      Failure to Obtain Board Approval for Major Events**

21.      On critical events, IFS and Dresnick failed to secure necessary board approval for certain events.  Those events include:  (1) the Eastern Institutional Funding financial transaction was conducted without proper board approval prior to completion of the transaction despite representation being made that such approval had been obtained; and (2) in July 2012, Dresnick issued himself, without board approval, 15 million shares of stock and issued another 52.5 million shares to non-affiliates in a move to convert debt to equity, despite reporting in a Form 8-K filing on July 2012 that board approval had been obtained.

22.      Upon information and belief, in April 2012, and contrary to representations by Defendant Robert Hoffman, an IFS attorney, in an opinion letter to the transfer agent for IFS securities that proper board approval had been received for one particular transaction, such board approval had not been obtained.  This representation was false. Defendant Hoffman's opinion letter

was instrumental in ensuring that the shares being transferred were done so free of restriction which meant they were immediately negotiable.  Such restriction would have prevented Dresnick and those with whom he associated from immediately selling those shares and acquiring much needed funds to the detriment of IFS' shareholders.  Defendant Hoffman is Defendant Dresnick's childhood friend and a divorce lawyer by trade.  Hoffman does not hold himself out as an experienced securities lawyer.

> **E.      Eastern Institutional Funding ("Eastern" or "EIF") Transaction**

23.      In February 2012, Dresnick began exploring a financing deal with Eastern Institutional Funding ("Eastern" or "EIF").  As explained by Eastern to executives of IFS, the parameters of the transaction would involve Eastern assuming a portion of IFS' debt by way of a convertible note which would allow Eastern to convert the note to freely trade-able shares that could be sold immediately.  Dresnick handled all negotiations with Eastern's president/CFO.  Dresnick advised that such negotiations were under the auspices of raising capital for IFS.

24.      The financing deal between Eastern and IFS was struck whereby Eastern would acquire $100,000 of pre-existing debt in exchange for $1 million shares being issued by IFS.  Eastern would receive 1 million freely traded shares and would begin to trade those shares.   The proceeds of sale would first go to pay of the $100,000 pre-existing IFS debt and then the remainder of the proceeds from the sale of shares would be split 60% to Eastern and 40% to IFS.

25.      At the time of the Eastern transaction IFS had roughly 7 million shares of common outstanding.  The 1 Million shares issued to Eastern would therefore represent about 14% of the company's outstanding common stock.  Further, the IFS shares given to Eastern were issued at $0.10/share. At the time, IFS shares were trading at $1.40/share.  None of these material facts were

disclosed by IFS or the Company Defendants at the time.  All of these material facts were required to be reported.

26.     IFS issued shares to Eastern purportedly in exchange for Eastern's assumption of $100K in debt.  However, the agreement memorializing the purported assignment of debt to Eastern did not take payment responsibility away from IFS.  The language of the note which was executed on March 18, 2012 reads as follows:

*"EIF and IFS shall jointly and severally be obligated to pay the following amounts of principal and interest to AHA: (a) EIF and/or IFS shall pay to AHA the sum of $10,000 within ten business days of the effective date of this Third Amendment; (b)EIF/and or IFS shall pay to AHA the sum of $26,666.67 on each of April 15, 2012, May 15, 2012 and June 15, 2012; and (c) EIF and/or IFS shall pay to AHA all remaining principal and accrued interest due under the Note on or before July 15, 2012."*

27.     The transaction which netted Eastern 1 million shares of IFS stock was purportedly consideration for Eastern's assumption of $100,000 in pre-existing IFS debt.  However, this transaction did not remove any debt payment obligations by IFS and merely was a rouse to allow IFS and the Company Defendants to transfer 1 million shares to Eastern under the guise of a legitimate debt conversion transaction.   None of these material facts were disclosed in any IFS' SEC filing.

28.     The IFS Board did not approve this deal in advance.  IFS held a board meeting in December 2011 and another one on April 24, 2012.  Later when these events were disclosed to the board in the April 24, 2012 board meeting attended by the Company Defendants, the Board did not require disclosure of these events in SEC filings.

29.     IFS employees who asked how Eastern could trade such volume over a short period of

time were told by Dresnick not to ask too many questions and that Eastern's principal had a network of individuals that could get the trading done.

30.     Since the trading volume of IFS stock was historically and IFS' financial statements were not good, Dresnick advised employees of IFS to provide Eastern with a list of 14 press release headlines that could be submitted for a period of time to support the higher volume in trades.  These press releases would be used to help IFS justify a jump in trading volume.  Eastern principals had advised that in the past they had successfully used this strategy to support similar actions with other companies.

31.     Dresnick worked and brainstormed on a list of possible headlines.

32.     On March 21, 2012, the president/CFO of Eastern sent an email to Dresnick stating "trying to give you time frame of money back in hands, will know when [share certificates] are cleared.  Also I need 14 headlines for news."

33.     On March 24, 2012, Dresnick advised Robert Hoffman, outside counsel for IFS, that he should work with IFS' CFO and the principal with Eastern to prepare "rep letters> I put a draft together for you."  Decidedly, Hoffman was not IFS' corporate securities lawyer, as IFS had contracted another lawyer to serve as IFS' corporate securities lawyer.  Dresnick sought the assistance of Hoffman in order to secure a favorable and material inaccurate opinion letter.

34.     On March 27, 2012, Hoffman emailed "revised Attorney Opinion Letters" to Dresnick and IFS' CFO.  The draft letters contain various false presentations by Hoffman.  Upon information and belief, an opinion letter in substantially the form provided in draft was submitted to the transfer agent.

35.     Upon information and belief, Hoffman represents in the opinion letter that:

(1) he examined an IFS board resolution of even date regarding the Eastern transaction. This representation is plainly false as there was no board meeting;

(2) he examined a Note purchase agreement dated March 1, 2010 in which the previous lender sold its note to Eastern. This representation is false as no such document exists that is dated March 1, 2010; and

(3) he examined a debt conversion agreement dated March 1, 2010 between Shareholder and the Company. No such document exists dated March 1, 2010.

36.     The stated purpose of Hoffman's opinion letter was to provide an attorney opinion that the Eastern transaction could proceed without restriction on the shares and that the shares issued to Eastern were immediately and freely trade-able. Indeed, Hoffman's ultimate opinion as stated in his letter is that the shares of common stock could be issued to the shareholder without restrictive legend, and the Shareholder may sell the shares free of any restrictions on transfer without registration under the Securities Act pursuant to a exemption from such registration requirements as set forth in Rule 144 promulgated under Section 4(1) of the Securities Act.

37.     The IFS securities obtained by Eastern were restricted securities in that they were acquired in an unregistered, private transaction from IFS. Under the Securities Exchange Act of 1934, Eastern was required to hold the IFS securities for a period of at least six months before being able to trade the securities. And the IFS securities would have reflected such restriction on their legend. However, a holder of restricted securities who qualifies for one of the recognizable exemptions to this holding requirement may be allowed to trade the stock without restriction. Eastern did not qualify for any such exemption. Hoffman's opinion letter was, therefore, critical to allowing Eastern to have the restrictive legend removed. Without the Hoffman Opinion Letter, Eastern would not have received the IFS shares without restrictive legend and freely trade-able, and would have been unable to immediately sell the IFS shares as they did.

38.     On March 29, 2010, the principal of Eastern provided three separate companies for which IFS shares should be issued so as to avoid disclosure and securities transfer restrictions that result when any one shareholder receives more that 10% of shares of Common Stock of a company. The million shares to one entity would have resulted in approximately 14% being transferred.  Upon information and belief, all three companies were either controlled by or affiliated with Eastern and/or its president/CFO.  By breaking up the transfer of shares, Eastern received 7.9% of outstanding shares, while the two remaining companies selected by Eastern received 3.9% each.  The event of ownership of over 14% of IFS stock would have triggered disclosure, as well as restriction requirements on trading by SEC.

39.     On IFS shareholder lists for March 31, 2012, the records reflect that 500,000 shares were registered in Eastern Institutional Funding LLC, 250,000 shares to New Money Productions, Inc., and 250,000 shares to D&G Equities LLC.  Both New Money Productions and D&G Equities were companies affiliated with Eastern.  All the shares were reflected as "Free Trading" on IFS's shareholder registry.

40.     As part of the transfer, Eastern's president/CFO asked IFS to create a list of 14 potential press releases.  These potential press releases were to be sent to Eastern in advance of their release in order for Eastern to plan a trading strategy.

41.     On April 3, 2012, Dresnick emailed the IFS' acting CFO suggesting possible topics for press releases.

42.     On April 9, 2012, Eastern's president/CFO emailed IFS' acting CFO asking that the list of possible headlines be sent to a private Gmail address that he provided.  IFS' acting CFO, feeling uncomfortable with this request, declined.

43.     On April 19, 2012, Dresnick questioned IFS' acting CFO why the proposed headlines had not been sent to Eastern and directed the employee to provide the list to Eastern's principal.  The acting CFO again declined.

44.     On April 19, 2012, IFS acting CFO and IFS SEC counsel continued to communicate regarding the concerns of IFS' acting CFO.   In one email exchange, IFS SEC counsel requested copies of the Eastern transaction documents; reiterated that he had not been advised of the deal; and asked whether he should prepare the SEC Form 8k Filings.

45.     On April 19, 2012, and immediately following the email with IFS' SEC counsel, IFS' acting CFO received an email from Dresnick advising:  "Please do not send [IFS' SEC counsel] anything.  We were not going to disclose [Eastern].  Please let me be the only one to speak to [IFS' SEC counsel].  We are crossing each other."

46.     On April 20, 2012, IFS' acting CFO expressed concern to IFS' SEC counsel that the company was not complying with SEC disclosure rules, particularly with respect to the recent Eastern financing deal and that board disclosure and approval rules were being violated.

47.     On April 20, 2012, IFS' SEC counsel via email advised that IFS' acting CFO had to bring this matter to the attention of the board.

48.     IFS' acting CFO later met with IFS SEC counsel and was advised that the deal was not proper in many respects and that it definitely needed to be disclosed.  IFS' acting CFO was again instructed by IFS SEC counsel to inform the board.

49.     On April 20, 2012, IFS' acting CFO advised the Board of these concerns.

50.     On April 20, 2012, an IFS' board member requested a meeting of the IFS board.

51.     On April 22, 2012, Defendant Hoffman advised of the time and place of the board

meeting.

52.     On April 24, 2012, an IFS' board meeting was conducted whereby IFS' acting CFO expressed concerns about the disclosure issues.  After the meeting, the board did not provide immediately disclosures as required by law.  On April 24, 2012, IFS' acting CFO, Founder and VP of Sales & VP product management resigned and a new IFS CFO was selected.  And on May 17, 2012, the newly appointed IFS CFO resigned his position.  Subsequently, Dresnick assumed the duties of interim CFO for IFS.

53.     The Eastern transaction was executed and the stock certificates were issued in March 2012.  No SEC Form 8K was filed at the time of the Eastern deal and it was not disclosed in the subsequent events section of the SEC Form 10K (filed on 4/17/2012).  It was finally disclosed, albeit inaccurately, in the SEC Form 10Q, filed on 5/21/2012 and signed by Defendant Dresnick.  By then, the irrecoverable damage to stock price had occurred, as on May 21, 2012 IFS' stock was trading at 6 cents per share.

54.     This late disclosure allowed for Eastern to sell the 1 million shares of IFS common stock without any meaningful disclosure of the Eastern transaction.

55.     The disclosure in the SEC Form10Q on May 21, 2012 is also misleading, inadequate and inaccurate in that it materially misreported the number of shares given, did not disclose that IFS was still fully responsible for payments on the pre-existing debt despite the conversion of 1 million shares, and failed to disclose the 60/40 payment arrangement between IFS and Eastern.

**F.     Star Medical Eviction and Loss of Manufacturing Capabilities**

56.     IFS subleased it manufacturing facility and a critical manufacturing machine from Star Medical in Medley, Florida.  IFS was evicted from that facility after a writ of possession in favor

of the landlord was issued by the Florida state court.  Upon eviction on April 20, 2012, IFS lost

access to its manufacturing facility and all of its manufacturing equipment.  IFS' manufacturing

capabilities were terminated at that time.  As for the manufacturing equipment which was subleased,

Star Medical sold the equipment after IFS defaulted on its lease payments.

    57.    These events were either not reported or not reported accurately in order to allow IFS

and Dresnick to further manipulate the information being disseminated to the public.

    58.    An April 20, 2012 email reflects that IFS and Dresnick were provided actual notice

that the Star Medical landlord served formal eviction and writ of possession.  Again, this was not

disclosed as required by SEC Form 8K.

    59.    In an email dated April 21, 2012, IFS' corporate securities counsel warned various

IFS directors and employees that:

> "On the issue of our firm acting as corporate securities counsel, we are pleased to perform this service for IFS.  As most of you know, thus far we have not been able to perform this role adequately because we have not been kept in the loop of the company's activities.  Accordingly, we have been relegated to a reactive role and only advise when asked to (e.g.: a week before a mandatory report is due).  Given this, **it is not surprising that the company and certain of its officers and directors are non compliant with federal securities laws obligations."**
>
> "Currently, IFS neither has the funds nor the internal personnel to operate as a public company.  To me, this is your challenge.  If you want to remain public, you need systems in place to assure the integrity of your disclosure and skilled personnel to operate those systems.
>
> "On the specific issue of the mfg facility, I believe the lawsuit was disclosed by the company in the K and it provided that while there can be no assurances, the company hoped to settle the matter.  **If the mfg is interrupted for a time that could result in a material adverse effect to IFS, disclosure of that interruption is required."**

*(emphasis supplied)*.

18

60.     On the May 21, 2012 – well into efforts by IFS, Dresnick and Eastern to engage in a mass sell-off of IFS shares, IFS disclosed in its Form 10-Q the Star Medical eviction.  Yet, the Star Medical disclosures were materially inadequate and incorrect in that the Form 10-Q advises of a possible settlement and purchase of the equipment when at the time the equipment had already been sold by Star Medical and the prospects of a settlement were impossible.

**G.     Stock Points**

61.     These failures to disclose or provide complete disclosure resulted in a false stock price or market price that was controlled or manipulated by incomplete and inaccurate public information about IFS and the Company Defendants.

62.     IFS and Dresnick attempted to hold market prices and volume despite the adverse and unreported conditions at IFS.  In such a way, IFS and Dresnick cashed out on the sale of IFS stock at expense of IFS' shareholders when it allowed IFS and Eastern to flood the market thereby destroying IFS's stock value.

63.     Stock prices for IFS are plotted as such:

| | |
|---|---|
| 12/1/11 | $2.58/share |
| 12/30/11 | 2.3 |
| 3/18/12 | 1.4 |
| 3/30/12 | .85 |
| 5/1/12 | .51 |
| Present | .02 |

64.     Trading volume for IFS was as follows:

May 2012                              approx. 82,000 shares per day average

Previous three month average trading volume:

| | |
|---|---|
| April 2012 | 1,616 shares per day average |
| March 2012 | 1,225 shares per day average |
| February 2012 | 1,413 shares per day average |

19

The anomaly in trading experienced in May 2012 was precipitated in large part to trading spikes of 120,000 shares, 901,000 shares and 186,0000 shares on May 9, 10 &11, 2012, respectively.

65.     As late as August 2012, Defendant Dresnick boasted to IFS shareholders that as a result of the above maneuverings he had acquired 80% of IFS common stock and that as a result no efforts by IFS shareholders could defeat him or otherwise be successful.

**H.     Scienter Allegations**

66.     As alleged herein, IFS and the Company Defendants acted with scienter in that they knew that the public documents and statements, issues and disseminated by or in the name of IFS were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of federal securities laws.  As set forth, elsewhere in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding IFS  and its business practices, their control over and/or receipt of IFS allegedly misleading misstatements and/or their association with IFS which made them privy to confidential proprietary information concerning IFS were active and culpable participants in the violations of federal securities laws alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public and their shareholders.  This case does not involve false forward looking statements or projections but instead involves false statements concerning IFS' business, finances and operations.  The ongoing violations of federal securities laws could not have been perpetrated without the knowledge and complicity of the Company Defendants.

### I.      Loss Causation

67.      As a result of the conduct alleged in greater detail above, Defendants false statements through its incomplete, late and misleading public disclosures starting in December 2011 artificially maintained the price of IFS stock whereby allowing the Defendants to flood the market with IFS stock starting in April 2012 to the benefit of IFS and the detriment of IFS shareholders.  When IFS shareholders discovered this activity by the Defendants, their investments were virtually lost with IFS' stock trading now around 1 cent per share.  The economic loss, i.e., damages suffered by Plaintiffs was a direct result of Defendants' violations of the federal securities laws.  The precipitous drop in stock price is directly related to Defendants' efforts at selling off IFS shares to the detriment of its shareholders and the personal gain of IFS.

### J.      Applicability of Presumption of Reliance

68.      At all relevant times, the market for IFS' common stock was an efficient market for the following reasons, among others:

a.      IFS common stock met the requirements for listing, and was listed and actively traded on the OTC-QB, a highly efficient and automated market;

b.      as a regulated issuer, IFS filed periodic reports with the SEC;

c.      As a result, the market for IFS securities promptly digested current information with respect to IFS from publicly available sources and reflected such information in IFS' stock price.

### K.      No Safe Harbor

69.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  None of the allegedly false and misleading statements pleaded herein was a forward

looking statement nor were any statements identified as "forward-looking statements" when made.

## COUNT I

### (Violation of Section 10(b) and Rule 10b-5)
### Concealment of Material Adverse Facts

70.     Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1 through 69 as if fully stated herein.

71.     In connection with the purchase and sale of IFS' stock, Defendants IFS, Dresnick, Higgins and Kuechenberg made or facilitated the making of false representations of material fact and omission to disclose material information.

72.     Specifically and as set forth above, Defendants deliberately or with reckless disregard failed to inform and disclose, as required by the securities laws, materially adverse information regarding IFS and its operations.

73.     Defendants knowingly or with reckless disregard concealed information related to the loans in order to

74.     In making or allowing false material misrepresentations and omissions, Defendants acted with the requisite scienter required by law.

75.     Plaintiffs detrimentally relied upon Defendants' acts, as evidenced by their acceptance of the materially incorrect public disclosures of IFS as well as the public and private representations of Defendant Dresnick on the health of IFS financial situation and the shareholder's investment in IFS.

76.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated there under.

77.     As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs suffered damages in an amount to be determined at trial.

78.     The aforementioned conduct of Defendants IFS and the Company Defendants was an intentional or reckless manipulation, misrepresentation, and/or concealment of material fact known by them with the intention on the part of Defendants IFS and the Company Defendants of thereby depriving Plaintiffs of property or legal rights or otherwise causing injury, sufficient to justify punitive damages.

Wherefore, Plaintiffs demand judgment against Defendants IFS and the Company Defendants for damages, punitive damages, prejudgment interests, costs, and all such other relief the Court deems just and proper.

## COUNT II

### (Violation of Section 10(b) and Rule 10b-5)
### IFS Pump and Dump

79.     Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1 through 69 as if fully stated herein.

80.     Upon information and belief and as set forth herein, during the period of at least December 2011 to May 2012, IFS' stock price and trading volume were artificially controlled by Defendant IFS and the Company Defendants for the purpose of engaging in stock manipulation.

81.     Defendant IFS and the Company Defendants, with the intent to induce others to purchase or induce others not to sell IFS securities, did knowingly or with reckless disregard misstate material facts and omit material facts when it created a false market for its securities beginning in at least December 2011.

23

82.     Defendant IFS and the Company Defendants knowingly or with reckless disregard employed a pump and dump or stock manipulation which inflated or held the price of IFS stock steady.  At the time IFS and Defendant Dresnick began discussions with a third party to engage in a sell-off of a massive amount of IFS stock to the benefit of IFS and the detriment of its shareholders. Plaintiffs had no knowledge of the manipulation of IFS' stock price, market and trading volume.

83.     Defendant IFS and the Company Defendants engaged in transactions and practices or courses of business that operated misrepresentations upon purchasers or holders of IFS securities, specifically Plaintiffs, when they caused hundreds of purchases or sales of IFS stock to be executed in the accounts which it controlled or further influenced the investment decisions of shareholders.

84.     In the manner described above, Defendant IFS and the Company Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated there under.

85.     As a direct and proximate cause of the wrongful conduct of Defendants IFS and the Company Defendants, Plaintiffs have suffered damages in an amount to be determined at trial.

86.     The aforementioned conduct of Defendants IFS and the Company Defendants was an intentional or reckless manipulation, misrepresentation and/or concealment of a material fact known by them with the intention on the part of Defendants of thereby depriving IFS of property or legal rights or otherwise causing injury, sufficient to justify punitive damages.

Wherefore, Plaintiffs demand judgment against Defendants IFS and the Company Defendants for damages, punitive damages, prejudgment interests, costs, and all such other relief the Court deems just and proper.

## COUNT III

### (Control Person Liability Under Section 20 against Dresnick)

87.     Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1 through 69 as if fully stated herein.

88.     As set forth above, IFS has violated Section 10b-5 of the Exchange Act and Rule 10b-5.

89.     Dresnick, Higgins and Kuechenberg acted as a controlling persons of IFS within the meaning of Section 20 of the Exchange Act as described therein and exercised control of the corporate operations of IFS in general.  Specifically, Dresnick has the power and authority to cause IFS to engage in the wrongful conduct complained of herein by virtue of his positions a chairman, president, chief executive officer and interim chief financial officer of IFS.  In addition, Dresnick engaged in culpable conduct with respect to the self-interested loan transactions described herein as well as the failure of IFS to perform its obligations in properly reporting material information on various public filings with the SEC.

90.     By reason of the wrongful conduct alleged herein, Dresnick, Kuechenberg and Higgins are jointly and severally liable pursuant to Section 20(a) of the Exchange Act for the conduct of IFS.  As a direct and proximate result of this wrongful conduct, Plaintiffs suffered damages in connections with its purchases of IFS stock in an amount proven at trial.

Wherefore, Plaintiffs demand judgment against Defendants Dresnick, Kuechenberg and Higgins for damages, punitive damages, prejudgment interests, costs, and all such other relief the Court deems just and proper.

25

## COUNT IV

### (Control Person Liability Under Section 15 against Dresnick)

91.     Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1 through 69 as if fully stated herein.

92.     As alleged more fully above, the conduct of Defendants Dresnick, Kuechenberg and Higgins violated Section 15 of the Securities Act of 1933.

93.     During all times material to this action, Dresnick, Kuechenberg and Higgins has the power, both direct and indirect, to control IFS, did in fact exercise such control, and were therefore "controlling persons" within the meaning of Section 15 of the 1933 Act.

94.     Plaintiffs have been damaged by the wrongful conduct of Dresnick, Kuechenberg and Higgins through their control of IFS, in that the wrongful conduct caused Plaintiffs to invest in IFS and lose their money.

95.     As such, Dresnick, Kuechenberg and Higgins are liable for all damages or losses suffered by Plaintiffs.

Wherefore Plaintiffs demand judgment against Dresnick, Kuechenberg and Higgins, joint and severally, for the rescission and/or damages, pre-judgment interest, costs, and all such other relief the Court deems just and proper.

## COUNT V

### (Breach of Fiduciary Duty)

96.     Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1 through 69 as if fully stated herein.

26

97.     Plaintiffs bestowed and shared a relationship of trust with Defendants IFS and the Company Defendants whereby Defendants IFS and the Company Defendants held themselves out as worthy of trust and confidence of Plaintiffs, Plaintiffs in fact reposed trust and confidence in Defendants IFS and the Company Defendants to protect Plaintiffs' investment in IFS and to ensure that IFS was operating in compliance with federal securities laws, and Defendants IFS and the Company Defendants undertook such trust and assumed a duty to protect Plaintiffs' investment and insure that IFS operated in compliance with the law so as to protect Plaintiffs' investment.

98.     Defendant IFS and the Company Defendants breached their duties to Plaintiffs and to protect Plaintiffs' investment.

99.     Defendant IFS and the Company Defendants' breaches caused Plaintiffs to suffer damages.

Wherefore, Plaintiffs demand judgment against Defendants IFS and the Company Defendants for damages, prejudgment interests, costs, and all such other relief the Court deems just and proper. Plaintiffs further reserve the right to seek punitive damages.

## COUNT VI

**(Aiding and Abetting a Breach of Fiduciary Duty against Richard Hoffman)**

100.     Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1 through 69 and paragraph 96 through 99 as if fully stated herein.

101.     At all time material hereto, Hoffman was an attorney, duly licensed and in good standing with the state of Florida.

102.    The Defendants, other than Hoffman, breached their fiduciary duty to Plaintiff shareholders which resulted in damages to the individual shareholders.   Without the assistance and cooperation of Hoffman, Defendants would have been unable to breach their fiduciary duty.

103.    Hoffman knew of the Defendants' breach of fiduciary duty to the shareholders when he prepared and submitted the opinion letter regarding the Eastern stock transaction.   The opinion letter contained false information which by its nature Hoffman knew or should have known to be false.   Hoffman provided substantial assistance in the commission of the Defendants' breach of fiduciary duty.   Without the Hoffman Opinion Letter, IFS' stock would have been transferred with restriction and not freely trade-able.   Hoffman's actions were critical to the success of Defendants' breach.

104.    Plaintiffs suffered damages as a result of Hoffman's actions.

Wherefore, Plaintiffs demand judgment against Defendant Hoffman for compensatory damages, pre-judgment interest, costs and such other relief as this Court deems just and proper. Plaintiffs further reserve the right to seek punitive damages.

## COUNT VII

### (Negligent Misrepresentation)

105.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1 through 69 as if fully stated herein.

106.    As set forth above, Defendant Dresnick made false statements in connection with the purchase, sale or financial strength of a security – the investments instruments purchased or held by Plaintiffs – regarding the IFS investment opportunity.   The representations as to the strength or the

28

IFS investment opportunity were not only false but were material to Plaintiffs for their investment of money and their continued confidence in IFS.

107.    Through Dresnick's own negligence, Dresnick may have believed that the above representation was true, but through his own negligence or mistake that the statement was false.

108.    Dresnick provided representations to Plaintiffs about the strength of the investment and about IFS current ability to secure necessary capital financing that induced to Plaintiffs to invest or to otherwise hold their investment position in IFS.

109.    Plaintiffs' reliance on the representation of Dresnick was justified.

110.    As a result Plaintiffs suffered damages resulting from their acting in justified reliance upon the misrepresentations of Dresnick.

WHEREFORE, Plaintiffs demand judgment against Defendant Dresnick for damages including interest, costs, reasonable attorneys' fees and such other and further relief as this Court deems proper.   Plaintiffs further reserve the right to seek punitive damages.

### JURY DEMAND

As to the above, Plaintiffs expressly demand trial by jury as to those counts appropriately tried before a jury.

Dated:  August 29, 2012                         Respectfully submitted,


                                        By:    _s/ Alexander Angueira_____
                                               Alexander Angueira, Esq.
                                               FL Bar No. 0716091
                                               Alexander Angueira, P.L.L.C.
                                               7301 S.W. 57th Court, Suite 515
                                               Miami, FL  33143
                                               Telephone: 305.357.9031/Facsimile: 305.357.9050
                                               alex@angueiralaw.com
                                               *Attorney for Plaintiffs*

29